**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE BELLSOUTH CORPORATION ERISA LITIGATION | ) ) ) ) |
| THIS DOCUMENT RELATES TO: | ) ) ) |
| All Actions | ) |

MASTER FILE:
1:02-CV-2440-JOF

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL
OF ERISA SETTLEMENT AGREEMENT**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     THE LITIGATION AND SETTLEMENT .............................................2

    A.      Procedural History.........................................................................2

    B.      Settlement Negotiations. ...............................................................4

    C.      Terms of the Settlement. ...............................................................5

    D.      Compliance with Notice Requirements .........................................8

III.    THE SETTLEMENT WARRANTS FINAL APPROVAL ...........................9

    A.      Factor One - the Likelihood of Success at Trial. ...............................12

    B.      Factor Two - Range of Possible Recovery.........................................15

    C.      Factor Three - the Settlement Amount in Relation to
        Discount for Inherent Risks at Trial..................................................19

    D.      Factor Four - the Complexity, Expense, and Likely Duration
        of Continued Litigation. ....................................................................20

    E.      Factor Five - Objections to the Settlement.........................................22

        1.      The Settlement Provides Benefits to Retirees and Does
            Not Release Any Individual Claims They May Have .............23

        2.      Objections by Those Who Generally Disapprove of
            this Litigation Should Not Preclude Settlement .....................24

        3.      Plaintiffs' Attorneys' Fees and Costs are Reasonable.............25

        4.      The Remaining Objections Lack Merit ...................................28

    F.      Factor Six - The Stage of Proceedings at the Time of
        Settlement. ..........................................................................................31

IV.     CONCLUSION...........................................................................................32

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534 (S.D. Fla. 1988),
    *aff'd*, 899 F.2d 21 (11th Cir. 1990) ................................................................10

*Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984) ................................. 9, 11

*Bennett v. Behring Corp.*, 96 F.R.D. 343 (S.D. Fla. 1982)....................................22

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) .................................9

*Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir. 1974)........................28

*Cokenour v. Household Int'l Inc.*, No. 02-7921, 2004 U.S. Dist.
    LEXIS 5286 (N.D. Ill. Mar. 31, 2004) ...........................................................13

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ........................................... passim

*Dasler v. E.F. Hutton & Co., Inc.*, 694 F. Supp. 624 (D. Minn. 1988)...................16

*Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985)..................................... 15, 16

*Eaves v. Penn*, 587 F.2d 453 (10th Cir. 1978)........................................................15

*Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567 (5th Cir. 1960) ...........................10

*Gee v. UnumProvident Corp.*, No. 03-147, 2005 U.S. Dist. LEXIS
    3183 (E.D. Tenn. Jan. 14, 2005)......................................................................13

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ...........................................................25

*Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361 (N.D. Ga. 2004)................... 2, 3, 12

*Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079 (N.D. Ill. 2004) ..........................13

*In re ADC Telecomms., Inc., ERISA Litig.*, No. 03-2989, 2004 U.S.
    Dist. LEXIS 14383 (D. Minn. July 26, 2004) .................................................13

*In re AEP ERISA Litig.*, 327 F. Supp. 2d 812 (S.D. Ohio 2004)............................13

*In re AOL Time Warner, Inc., Sec. & "ERISA" Litig.*, No. 02-8853,
    2005 U.S. Dist. LEXIS 3715 (S.D.N.Y. Mar. 10, 2005)................................13

*In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350 (N.D. Ga.
    2005) ................................................................................................................14

*In re Cardinal Health, Inc. ERISA Litig.,* 424 F. Supp. 2d 1002 (S.D.
    Ohio 2006) .......................................................................................................13

*In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898 (E.D. Mich. 2004) ...................................................................................13

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 228 F.R.D. 541 (S.D. Tex. 2005) ...................................................... 10, 20

*In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850 (N.D. Ohio 2006) ...................................................................................12

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ............................................19

*In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................................21

*In re Goodyear Tire & Rubber Co. ERISA Litig.*, 438 F. Supp. 2d 783 (N.D. Ohio 2006) ........................................................12

*In re Honeywell Int'l ERISA Litig.*, No. 03-1214, 2004 U.S. Dist. LEXIS 21585 (D.N.J. Sept. 14, 2004) ..........................13

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 209 F.R.D. 94 (E.D. Pa. 2002) .......................................................... 10, 20

*In re JDS Uniphase Corp. ERISA Litig.*, No. 03-04743, 2005 U.S. Dist. LEXIS 17503 (N.D. Cal. July 14, 2005) ...............13

*In re McKesson HBOC, Inc. ERISA Litig.*, No. 00-20030, 2002 US Dist. LEXIS 19473 (N.D. Cal. Sept. 30, 2002) ................17

*In re Mut. Funds Inv. Litig.*, 403 F. Supp. 2d 434 (D. Md. 2005) ...........................13

*In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461 (S.D.N.Y. 2005) .....................13

*In re Schering-Plough Corp. ERISA Litig.,* 420 F.3d 231 (3d Cir. 2005) ...................................................................................13

*In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207 (D. Kan. 2004)...............13

*In re Syncor ERISA Litig.*, 351 F. Supp. 2d 970 (C.D. Cal. 2004) .........................13

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-1335, 2004 U.S. Dist. LEXIS 24272 (D.N.H. Dec. 2, 2004) ..........................13

*In re U.S. Oil & Gas Litig.*, 967 F.2d 489 (11th Cir. 1992) ...................................10

*In re Westar Energy, Inc., ERISA Litig.*, No. 03-4032, 2005 U.S. Dist. LEXIS 28585 (D. Kan. Sept. 29, 2005) ........................13

*Officers for Justice v. Civil Serv. Comm'n of S.F.,* 688 F.2d 615 (9th Cir. 1982)....................................................................20

*Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005) ........................26

*Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1152 (5th Cir. 1978) .......................11

*Pietrangelo v. NUI Corp.*, No. 04-3223, 2005 U.S. Dist. LEXIS 40832
(D.N.J. July 18, 2005) .................................................................13

*Reynolds v. King*, 790 F. Supp. 1101 (M.D. Ala. 1990) .........................................20

*Saunders v. Berks Credit & Collections, Inc.*, No. 00-3477, 2002 U.S.
Dist. LEXIS 12718 (E.D. Pa. July 12, 2002) ......................................... 26, 28

*Sherrill v. Fed.-Mogul Corp.*, 413 F. Supp. 2d 842 (E.D. Mich. 2006) .................13

*Smith v. AON Corp.*, No. 04-6875, 2006 U.S. Dist. LEXIS 27297
(N.D. Ill. Apr. 12, 2006) ...............................................................12

*United States v. Tex. Educ. Agency*, 679 F.2d 1104 (5th Cir. 1982) .....................11

*Woods v. Southern Co.*, 396 F. Supp. 2d 1351 (N.D. Ga. 2005) ............................13

*Woodward v. NOR-AM Chem. Co.*, No. 94-780, 1996 U.S. Dist.
LEXIS 7372 (S.D. Ala. May 23, 1996) .........................................................20

**Statutes**

ERISA § 409, 29 U.S.C. § 1109 ................................................... 7, 8, 16

ERISA § 409(a), 29 U.S.C. § 1109(a) .......................................... 7, 8, 16

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) .............................. 5, 7, 8, 24

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) ................................... 8, 24

**Other Authorities**

Manual for Complex Litigation § 30.44 (2d ed. 1985) ...........................................19

Restatement (Second) of Trusts §205(c) (1959) ......................................................15

**Rules**

Fed. R. Civ. P. 23(e)(1)(B) ..........................................................................8

Fed. R. Civ. P. 23.2 .....................................................................................8

## I.    INTRODUCTION

Plaintiffs seek final approval of the proposed Settlement of this ERISA litigation pursuant to the Stipulation and Agreement of Settlement, as amended and submitted to the Court on June 16, 2006 (Docket No. 191) (the "Settlement Agreement"), which this Court preliminarily approved by order dated July 28, 2006 (Docket No. 194) (the "Preliminary Approval Order").  A copy of the proposed Order and Final Judgment is attached hereto as Exhibit A.

Notice of Pendency of Litigation, Proposed Settlement, and Hearing ("Notice"), has been provided to the approximately 71,426 current and former participants of the BellSouth Savings and Security Plan ("SSP") and the BellSouth Retirement Savings Plan ("RSP"; together, the "Plans") pursuant to the Preliminary Approval Order.  While this method of notice informed the Plans' participants of their right to object, Lead Counsel have received a relatively small number of objections in comparison to the tremendous number of Notices mailed.  As discussed below, Plaintiffs believe these objections lack merit and should not hinder the Court's approval of the Settlement Agreement and entry of the proposed Final Order and Judgment.

In addition, Lead Counsel note that, pursuant to the terms of the Settlement Agreement, and as required by Department of Labor regulations, an Independent Fiduciary, U.S. Trust Corporation ("U.S. Trust"), was retained by BellSouth, the sponsor of both Plans, to assess the fairness of the Settlement to the Plans.  U.S. Trust conducted a detailed review of the record and documents provided by counsel for the parties, including objections submitted, as well as extensive interviews with both Plaintiffs' and defense counsel and the mediator who worked closely with the parties

to develop the Settlement terms.  U.S. Trust has now concluded its review and has determined that the Settlement, including the compensation to be paid to Plaintiffs' Counsel as set forth in the terms of the Settlement Agreement are, from the Plans' perspective, fair and reasonable.

For the reasons set forth herein and previously, in the parties' Joint Motion for Preliminary Approval of Settlement and Approval of Notice to be Furnished to Plan Participants (filed May 10, 2006; Docket No. 188), Plaintiffs respectfully submit that the Settlement is in all respects fair, adequate and reasonable, and an excellent result for the Plans and their participants.  Accordingly, we ask that the Court grant final approval of the Settlement at this time.

## II.    THE LITIGATION AND SETTLEMENT

### A.    Procedural History

The Court is familiar with this ERISA breach of fiduciary duty action, commenced in 2002, as a result of the extensive briefing on the Defendants' motion to dismiss, which yielded the Court's opinion in *Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361 (N.D. Ga. 2004) (Forrester, J.), as well as briefing on class certification and numerous other issues, including discovery, and at least five hearings and conferences, primarily related to discovery and settlement issues.[1]

In brief, on April 21, 2003, with the benefit of informal discovery negotiated between Lead Counsel and Defendants, Plaintiffs filed their Consolidated Complaint

---

[1] For example, the Court convened conferences and heard motions on July 18, 2005 (discovery and scheduling conference before Judge Forrester, followed by discovery and scheduling conference with Judge Duffey), August 31, 2005 (telephonic discovery conference with Judge Duffey), September 9, 2005 (telephonic conference with Judge Duffey regarding discovery disputes), October 14, 2005 (discovery conference before Judge Duffey), and June 13, 2006 (settlement/preliminary approval conference before Judge Forrester).

for Violations of Employee Retirement Income Security Act (Docket No. 9) (the "Complaint").[2]  Defendants moved to dismiss the Complaint (Docket No. 19). Plaintiffs vigorously opposed the motion, submitting not only an opposition (Docket No. 25), but a surreply (Docket No. 31) and supplemental authority (Docket No. 41) as well.  The Court denied Defendants' motion without hearing.  *Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361 (N.D. Ga. 2004) (Forrester, J.) (Docket No. 42). Defendants answered the Complaint and the subsequent Amended Complaints (Docket Nos. 55, 139), and Plaintiffs replied to Defendants' counterclaims.  (Docket Nos. 59, 150).  The parties thereafter engaged in motion practice on a variety of issues, including class certification.[3]

The parties also commenced formal discovery pursuant to a detailed discovery plan.  During the summer of 2005, following denial in part of the Securities Defendants' motion to dismiss,[4] the ERISA and Securities parties agreed to coordinate discovery.  All discovery matters were referred to Judge Duffey, who established an aggressive schedule.

Plaintiffs served voluminous document requests, seeking discovery on ERISA-specific issues, as well as the underlying facts of the case.  The parties engaged in lengthy negotiations concerning the scope of Defendants' production.  In all, during the year and a half of discovery, Plaintiffs received and analyzed more than 512,000 pages of documents produced directly by Defendants, plus several hundred gigabytes

---

[2] The Complaint was thereafter amended on several occasions.  *See, e.g.,* Docket Nos. 54, 56, 124, and 182.  In addition, a separate Complaint was filed by the Joganic/RSP Plaintiffs on January 15, 2004.

[3] The Court ultimately denied Plaintiffs' motion for class certification.

[4] All references to the Securities Litigation are to *In re BellSouth Corporation Securities Litigation*, No. 02-2142 (N.D. Ga.).

of documents and related information made available through a website created by Defendants' document vendor.

Plaintiffs also served interrogatories, requests for admission, noticed depositions, engaged in third-party discovery and an extensive review of the publicly available information regarding the BellSouth's activities, retained expert witnesses to evaluate issues including damages, conducted discovery of Defendants' experts, responded to Defendants' discovery requests, including requests for production and contention interrogatories, and obtained several favorable discovery rulings.

## B.    Settlement Negotiations.

This case was hard-fought, and the parties vigorously represented their clients and pursued to the utmost their respective positions. This was apparent in briefing, discovery, and over the course of the six-plus months that the parties actively engaged in settlement negotiations.

After they were unable to reach common ground through private negotiation, during the fall of 2005, the parties agreed to formal mediation. On October 7, 2005, at the parties' request, the Court referred the case to mediation before the Honorable Nicholas H. Politan, retired United States District Judge and an experienced mediator.

The mediation was held in New York on November 1 and 2, 2005, during which time Lead Counsel made a detailed presentation of the facts of the case, claims, and damages. Even with Judge Politan's assistance, the parties disputed most aspects of each others' analyses. *See* Declaration of Nicholas H. Politan, ¶¶ 3-5.

While an agreement was not reached during the mediation, the parties continued to negotiate. Through a series of subsequent telephonic negotiation sessions, both with and without Judge Politan's involvement, the contours of a global

settlement agreement were developed.  In the following months, the parties engaged in detailed negotiation regarding the specific terms of the Settlement Agreement. Several drafts of the document were circulated among counsel before complete agreement was reached, and the final signature was obtained on May 10, 2006.

In sum, the Settlement was the result of lengthy and contentious arm's-length negotiations among the parties, insurers, highly experienced counsel, and Judge Politan.  The settlement process was in all respects thorough, adversarial, and professional.

**C.    Terms of the Settlement.**

The terms and conditions of the Settlement are set forth in the Settlement Agreement, an executed copy of which is attached hereto as Exhibit B.  Because the Agreement inures to the benefit of the Plans, as well as all of the Plans' participants, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), the case is being settled as a derivative action on behalf of the Plans.

The Agreement provides that the Defendants are to provide the following relief:

> (a)    For a period of three years beginning April 1, 2006, BellSouth Corporation will continue to make matching contributions to the Plans.

> (b)    For a period of three years beginning April 1, 2006, the Financial Performance Percentage used to calculate the match percentage in § 4(2)(a) of the Plans will not be less than 95%.

> (c)    Plan participants shall have the right to direct matching contributions made to their Plan accounts among the same alternatives available for Plan participants' own contributions for a period of three years beginning April 1, 2006.

(d)    BellSouth Corporation will make matching contributions in cash rather than in employer stock for a period of three years beginning April 1, 2006.

(e)    Certain lifestyle funds, life cycle funds or similar type funds will be made available as investment options under the Plans beginning April 1, 2006.

(f)    In 2006, the Plans will send materials to all participants that will include balanced information on the financial reasons for diversification of financial investments and the risks of over-concentration in a non-diversified company stock fund, such as the BellSouth Stock Fund.

(g)    If BellSouth is acquired by or merged with another company, the successor company will execute and perform BellSouth's obligations under this Agreement on terms not materially less favorable than those enumerated in subparagraphs (a) through (f) above.  Nonetheless, such obligations and terms will apply with respect to any such successor's plans only with respect to individuals who are Participants in the Plans.

(h)    If a Participant does not elect to receive a matching contribution under the Plans, subparagraphs (a), (b), (c) and (d) of this paragraph shall not apply with respect to such Participants.

(i)    Defendants will pay Lead Plaintiffs' Counsel attorneys' fees and expenses in the amount of $3 million.  Defendants will pay the RSP Plaintiffs' Counsel attorneys' fees and expenses in the amount of $675,000.

Settlement Agreement, ¶ 4.1.

The Settlement provides unique and valuable relief in the form of increased retirement investment security through payment of matching contributions that are no longer made in Company stock, but in cash, and not required to be invested and maintained in Company stock, a guarantee that matching contributions will continue to be made, an improved array of investment alternatives that are better-suited to the

participants' needs, and investor education. Importantly, the modification to the Plans set forth in (b) alone, i.e., that the increase in the Financial Performance Percentage used to calculate the match percentage in § 4(2)(a) of the Plans will not be less than 95%, has the potential to provide substantial monetary value to the Plans and the Plans' participants – *up to $90 million* – as of the date of the Settlement Agreement.

The release provisions of the Settlement Agreement were also negotiated at length and are quite unique to this Settlement. In essence, the Settlement provides for release of (a) the individual claims of the named Plaintiffs; and (b) claims asserted on behalf of the Plans under ERISA § 502(a)(2). Settlement Agreement ¶¶ 3.24 and 10.1-10.4. This is important for several reasons.

First, while the Settlement releases the Plans' claims for monetary relief under ERISA § 502(a)(2), these are claims that inure only to the benefit of the Plans, not to the benefit of individual participants. Indeed, a civil action for damages such as this one, alleging breach of fiduciary duty, may only be brought "by the Secretary, or by a participant, beneficiary or fiduciary" for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). In turn, ERISA § 409(a), entitled "Liability for Breach of Fiduciary Duty," provides that

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable *to make good to such plan any losses to the plan* resulting from each such breach, and to *restore to such plan any profits of such fiduciary* which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

ERISA § 409(a), 29 U.S.C. § 1109(a) (emphasis added). Sections 409 and 502(a)(2) provide no individual damages remedy to participants. Thus, it is only the Plans' claims that are being settled and only the Plans' claims for monetary damages that are being released.

Second, the settlement does not release any claims for individual relief or on behalf of the Plans that may be brought by Plans' participants under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

Third, released claims specifically do not include any claims brought against BellSouth and the other defendants in the ongoing Securities Litigation, or under any state or federal securities laws by any person who purchased or held BellSouth stock between November 7, 2000 and July 28, 2006. If a monetary settlement is achieved in the Securities Litigation, the Plans retain their right to submit a proof of claim and request a due portion of the settlement. This proof of claim will be made by the Plans, and include all appropriate claims on behalf of participants with respect to BellSouth Stock held in the Plans. In addition, individual claims for relief pertaining to any purchases of BellSouth stock outside of the Plans are in no way affected by the Settlement.

Fourth, released claims do not include any individual claims for benefits under ERISA.

In sum, the Settlement Agreement provides for wide-ranging, valuable relief, with an appropriately circumscribed release.

**D.    Compliance with Notice Requirements**

As required by Fed. R. Civ. P. 23(e)(1)(B) and 23.2, the requirements of due process, and the Preliminary Approval Order, the Plans' participants received proper

and adequate notice of the Settlement Agreement and the Fairness Hearing. On July 28, 2006, as part of the Preliminary Approval Order, this Court directed that the Notice of Pendency of Litigation, Proposed Settlement, and Hearing (the "Notice"), in the form submitted by the parties and approved by the Court, be provided to participants of the Plans and posted on the website proposed by the parties.

Pursuant to the Preliminary Approval Order, on or about August 17, 2006, the Notice was mailed to the last known address of all persons who were participants in the Plans between November 7, 2000 and July 28, 2006 (the date of the Preliminary Approval Order) and their beneficiaries. According to the Garden City Group, Inc., which was retained by Defendants for purpose of mailing the Notice, in total, at least 71,810 notices were mailed.[5] Defendants are to submit an affidavit attesting to the mailing of the notice by the Garden City Group, Inc. on or before October 17, 2006. The Notice properly advised the Plans' participants of all appropriate information regarding the Settlement, including their rights under the Agreement, and their right to object to the Settlement and to appear at the fairness hearing.

### III.    THE SETTLEMENT WARRANTS FINAL APPROVAL

"In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)[6]; *accord*, *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (quoting *Cotton*, 559 F.2d at 1330). In applying this standard, the

---

[5] This figure includes Notices sent in the initial mailing to all known affected participants, as well Notices that were re-sent due to address changes.

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the court adopted as binding all decisions of the former Fifth Circuit issued before October 1, 1981.

Court must determine whether, in light of the claims and defenses asserted by the parties, the proposed compromise represents a "reasonable evaluation of the risks of litigation." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960). Furthermore, the Court "should always review the proposed settlement in light of the strong judicial policy that favors settlements." *Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 538 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990); *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (noting that "public policy strongly favors the pretrial settlement of class action lawsuits."). Then-Chief Judge King has stated the following concerning the judicial favoritism shown toward the settlement of large and complex cases, such as this one:

> This policy has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources and achieve the speedy resolution of justice, for a just result is often no more than an arbitrary point between competing notions of reasonableness.

*Behrens*, 118 F.R.D. at 538 (internal citations and quotations omitted). ERISA actions of this sort are no exception, and many courts have noted the particular complexity of these actions. *See, e.g., In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 228 F.R.D. 541, 565 (S.D. Tex. 2005) (the "complexity, expense and likely duration of the litigation . . . are self evident and exceptional . . . ."); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 209 F.R.D. 94 (E.D. Pa. 2002) (the complexity and duration of litigation of similar breach of fiduciary duty claims, as well as the expense of litigation and risks of establishing liability and damages, weighed heavily in favor of settlement).

The Eleventh Circuit has stated that, in evaluating whether a proposed settlement is "fair, adequate and reasonable," the district court should look to the following six factors:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the complexity, expense, and likely duration of [continued] litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986.

In evaluating these considerations, the district court should not try the case on the merits nor "make a proponent of a proposed settlement justify each term of a settlement against a hypothetical or speculative measure of what concessions might have been gained. . . ." *Cotton*, 559 F.2d at 1330 (internal quotation and citation omitted). Furthermore, in considering whether a proposed settlement meets the applicable standard, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties." *Id*. Thus, if experienced counsel determine that a settlement is in the parties' best interests, "the attorney's views must be accorded great weight." *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1152, 1216 (5th Cir. 1978). Indeed, where experienced counsel have negotiated a settlement at arm's-length, with the help of an experienced mediator, a strong initial presumption is created that the compromise is fair and reasonable. *United States v. Tex. Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982).

Here, this presumption is born out by the benefits obtained by the Settlement. As a result of vigorous litigation and extensive arm's-length negotiations, the

Plaintiffs have obtained a substantial recovery that is clearly in the best interests of the Plans and their participants. Lead Counsel support the Settlement without hesitation.

## A.    Factor One - the Likelihood of Success at Trial.

As evidenced by the vigor with which they have prosecuted the action and the amount of time and money they have expended toward that end, Lead Counsel are optimistic about their ultimate success in this matter at trial. Plaintiffs are confident that their legal theories properly articulate a cause of action, as the Court found in denying Defendants' motion to dismiss, an important milestone in this litigation.[7]

But, of course, as in any litigation, there are risks here, and Plaintiffs are careful not to allow hubris to take the place of prudent evaluation of their claims. While Plaintiffs believe in the merits of their claims, and are encouraged by the Court's ruling on the motion to dismiss, they are mindful that this position was based solely on the allegations in the Complaint, rather than a review of the evidence Plaintiffs ultimately expect to present in this case. The Court recognized this in its opinion, for example, expressing "reservations about Plaintiffs' ability to muster sufficient facts in support of its claim that the Latin American investments rendered Company stock an imprudent investment." *BellSouth*, 313 F. Supp. 2d at 1368.

Defendants, likewise, have vehemently disputed Plaintiffs' claims throughout the litigation and will continue to do so, denying the existence of any facts that would

---

[7] The Court's decision to deny the motions to dismiss is consistent with that of many other district courts hearing similar ERISA breach of fiduciary duty claims, including, most recently, *inter alia*, *In re Goodyear Tire & Rubber Co. ERISA Litig.*, 438 F. Supp. 2d 783 (N.D. Ohio 2006); *Smith v. AON Corp.*, No. 04-6875, 2006 U.S. Dist. LEXIS 27297 (N.D. Ill. Apr. 12, 2006); and *In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850 (N.D. Ohio 2006).

support a finding of liability. Defendants have maintained their position that BellSouth committed no wrongdoing with respect to its accounting for advertising and publishing revenues or its Latin American investments, and that BellSouth stock was and has remained a prudent retirement. Furthermore, Defendants contest Plaintiffs' fiduciary allegations, contending, for example, that Defendants shifted all of their fiduciary duties to investment advisor State Street Global Advisors ("SSGA"), that SSGA was aware of all of the risks of BellSouth's Latin American operations, which were freely disclosed by BellSouth, and nevertheless gave its approval for the Plans' offering and investment in BellSouth stock.

Furthermore, while numerous favorable decisions have been rendered in similar ERISA breach of fiduciary duty company stock class actions on motions to dismiss, this is admittedly a rapidly developing and somewhat esoteric area of the law.[8] Only a few of the federal circuit courts have considered ERISA breach of

_____

[8] In addition to those listed above at n.5, favorable motion to dismiss decisions issued since this Court denied Defendants' motion to dismiss include, among others: *In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002 (S.D. Ohio 2006); *Sherrill v. Fed.-Mogul Corp.*, 413 F. Supp. 2d 842 (E.D. Mich. 2006); *In re Mut. Funds Inv. Litig.*, 403 F. Supp. 2d 434 (D. Md. 2005); *Woods v. Southern Co.*, 396 F. Supp. 2d 1351 (N.D. Ga. 2005); *In re Westar Energy, Inc., ERISA Litig.*, No. 03-4032, 2005 U.S. Dist. LEXIS 28585 (D. Kan. Sept. 29, 2005); *In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231 (3d Cir. 2005); *Pietrangelo v. NUI Corp.*, No. 04-3223, 2005 U.S. Dist. LEXIS 40832 (D.N.J. July 18, 2005); *In re JDS Uniphase Corp. ERISA Litig.*, No. 03-04743, 2005 U.S. Dist. LEXIS 17503 (N.D. Cal. July 14, 2005); *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461 (S.D.N.Y. 2005); *In re AOL Time Warner, Inc., Sec. & "ERISA" Litig.*, No. 02-8853, 2005 U.S. Dist. LEXIS 3715 (S.D.N.Y. Mar. 10, 2005); *Gee v. UnumProvident Corp.*, No. 03-147, 2005 U.S. Dist. LEXIS 3183 (E.D. Tenn. Jan. 14, 2005); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-1335, 2004 U.S. Dist. LEXIS 24272 (D.N.H. Dec. 2, 2004); *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079 (N.D. Ill. 2004); *In re Honeywell Int'l ERISA Litig.*, No. 03-1214, 2004 U.S. Dist. LEXIS 21585 (D.N.J. Sept. 14, 2004); *In re Syncor ERISA Litig.*, 351 F. Supp. 2d 970 (C.D. Cal. 2004); *In re AEP ERISA Litig.*, 327 F. Supp. 2d 812 (S.D. Ohio 2004); *In re ADC Telecomms., Inc., ERISA Litig.*, No. 03-2989, 2004 U.S. Dist. LEXIS 14383 (D. Minn. July 26, 2004); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207 (D. Kan. 2004); *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898 (E.D. Mich. 2004); and *Cokenour v. Household Int'l Inc.*, No. 02-7921, 2004 U.S. Dist. LEXIS 5286 (N.D. Ill. Mar. 31, 2004).

fiduciary duty company stock actions, and the Eleventh Circuit is not one of them. As demonstrated by district court rulings in other circuits, there is always a risk that a given judge in a given case will view a particular legal issue differently.

On the factual side, even though BellSouth's problems with its advertising and publishing revenue accounting and Latin American investments are now old news in the business community, presenting an ERISA case of this type to the Court is a mammoth undertaking, and there is always risk in so doing. As discovery progressed, it became increasingly apparent that the facts of the case would be difficult to prove.

This is not a case in which the Company's wrongdoing and the underlying imprudence of its stock has already been established. BellSouth did not restate its earnings, nor have the Defendants been the subject of an investigation or formal action by the Department of Labor, the Department of Justice, or the Securities and Exchange Commission, with respect to the fiduciary breached alleged.[9] In addition, many of the claims alleged by plaintiffs in the Securities Litigation were dismissed at the pleading stage. *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350 (N.D. Ga. 2005) (Duffey, J.) (dismissing, for example, claims brought under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, arising from allegations that Defendants failed to properly reserve for litigation contingencies, failed to timely

---

[9] While BellSouth was the subject of an investigation by the Securities and Exchange Commission ("SEC") and cease and desist order, and entered into a settlement with the SEC during 2002 with respect to allegations that BellSouth allegedly violated certain provisions of the Foreign Corrupt Practices Act in Latin America, Plaintiffs' claims regarding the imprudence of BellSouth's Latin American investments are much broader, and not limited to improper action taken by BellSouth to maintain its imprudent Latin American investments. To the best of Plaintiffs' knowledge, as confirmed through discovery, BellSouth was not subject to any other investigation by the SEC.

adopt Staff Accounting Bulletin ("SAB") 101 with respect to publishing revenues, overstated unbilled publishing receivables, overbilled Competitive Local Exchange Carriers ("CLECS"), and generally engaged in improper overbilling practices).

Moreover, as discussed below in connection with factor two – the range of possible recovery – the parties strongly disagree on a proper measure of damages. Even if Plaintiffs were to establish liability in this case, there is no assurance that a judgment would provide an equal or greater recovery than the relief obtained in the Settlement. Given the posture of the case, the potential for a favorable decision on the merits is not so much a foregone conclusion as to remove the impetus for settlement. Evaluation of this factor, therefore, weighs in favor of approval of the Settlement.

## B.     Factor Two - Range of Possible Recovery

In determining losses under ERISA, the relevant benchmark is what a prudent investment would have returned in lieu of the imprudent one. Drawing on the Restatement (Second) of Trusts, courts have described the goal for measuring losses as "restoring plan participants to the position in which they would have occupied but for the breach of trust." *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978); *see also Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) (explaining that "[o]ne appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust") (citing Restatement (Second) of Trusts §205(c) (1959)). Here, but for the imprudent investment in BellSouth stock, the Plans would have invested in some other investment whose performance must be considered in calculating losses.

Courts are not of one mind in the manner in which they measure other alternative investments and determine losses under ERISA § 409(a). In *Donovan*, 754 F.2d at 1056, the Second Circuit held that

> [w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.

*Id.* Other courts have measured losses by comparing the performance of the imprudent investment with the amount the plan "would have earned during this period as measured and adjusted by the movement of an appropriate index reflecting the stock market." *Dasler v. E.F. Hutton & Co., Inc.*, 694 F. Supp. 624, 634 (D. Minn. 1988) (looking to the return of the S&P 500 stock index for the purpose of establishing losses under ERISA § 409).

Here, whereas the value of the Settlement is fixed within a certain range, Plaintiffs' potential range of recovery is hotly disputed; if the case were litigated, the Defendants would vigorously challenge the existence of any damages at all.

As a methodological matter, the Plaintiffs' damages analysis is divided into a "holder" element and a "purchaser" element. The "holder" element consists of the damages resulting from a failure to dispose of the BellSouth stock when continuing to hold it was imprudent. The analysis indicates a capital loss of $1,881,731,922 for this element, plus the return from foregone investment, the proper measure of which is, as explained above, another issue strongly debated by the parties.

Defendants dispute the availability of relief for holder losses for two reasons. First, Defendants claim that the securities laws would have prevented them from divesting the Plans of the stock without first publicly disclosing the adverse information, and had such disclosure been made, the stock would have dropped, and the Plans would have suffered the same loss that occurred when the allegedly improper practices came to light. While Plaintiffs would dispute the extent, if any, to which any legally required public disclosure would have triggered the holder losses, they recognize a risk that this argument could be accepted. *See, e.g., In re McKesson HBOC, Inc. ERISA Litig.*, No. 00-20030, 2002 US Dist. LEXIS 19473, at *20-24 (N.D. Cal. Sept. 30, 2002).

Second, Defendants would argue that the recovery in the price of BellSouth stock would greatly reduce, and perhaps eliminate entirely, the holder damages.[10] While Plaintiffs disagree with Defendants' position, again they recognize that this argument poses a material risk with respect to the availability of holder damages.

With respect to the losses sustained by the Plans by the continued investment in BellSouth stock during the relevant period versus investment in a prudent alternative ("purchaser losses"), Plaintiffs' analysis indicates that the capital loss was $188,701,853, plus the return from foregone investment.

Plaintiffs anticipate that Defendants would advance three principal arguments to reduce or eliminate purchaser damages. First, as noted above in the context of holder damages, Defendants would argue that the rebound in the stock price

---

[10] As of November 7, 2000, the first day of the relevant period, BellSouth's stock closed at $38.67 per share. On Friday, September 22, 2006, BellSouth's stock closed at $43.23 per share. During the intervening period, the stock's low price was $18.32, on September 30, 2002, and its highest price was $50.63, on November 13, 2000.

eliminates any claim for purchaser damages, and that in fact the Plans realized significant profits from continuing to invest in BellSouth stock when the price was low. While Plaintiffs would dispute the Defendants' right to use profits from certain purchases to offset losses sustained on other purchases or on the imprudent holding of BellSouth stock, again they recognize a risk if this issue were litigated to a conclusion.

Second, Plaintiffs anticipate that Defendants would dispute when the continued investment in BellSouth stock became imprudent. The amount of purchaser damages in Plaintiffs' analysis is highly dependent on the date when continued acquisitions are deemed imprudent, so if Defendants were successful in this argument, the recoverable damages could be materially reduced.

Finally, Plaintiffs believe Defendants would argue that, during the relevant period, Defendants did take action to protect the Plans by selling stock and, in fact, the Plans were significant net sellers of BellSouth stock. During the period of the alleged breach, stock was both bought and sold by the BellSouth stock fund.[11] According to data for both Plans provided by the Defendants and their recordkeeper, over the relevant period, the Fund acquired 20.9 million shares of BellSouth stock, but sold 88 million shares of BellSouth stock. Thus, the Plans were net sellers of stock during the relevant period, which, Defendants claim, precludes any finding of purchaser damages. While Plaintiffs do not believe that this is necessarily demonstrative of a lack of purchaser damages to the Plans, again, they recognize this argument as a material litigation risk.

---

[11] Both Plans invested in the BellSouth Stock Fund, the assets of which were held in trust by the Plans' trustee, State Street Bank and Trust Company.

In summary, even assuming that Plaintiffs could establish liability at trial, there are several arguments available to the Defendants to reduce or eliminate entirely the damages that could be established. The Settlement provides valuable and substantial recovery for the Plans. Once Plaintiffs' potential recovery is discounted for risk, the adequacy of the Settlement is even more apparent. The differences and uncertainty in the proper measure of damages and the range of potential recovery, therefore, further support the Settlement.

## C.    Factor Three - the Settlement Amount in Relation to Discount for Inherent Risks at Trial

To assess the reasonableness of a proposed settlement seeking monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995) (citing Manual for Complex Litigation § 30.44 (2d ed. 1985)).

Plaintiffs face two primary sources of litigation risk in this case: the risk of establishing liability, and the risk of proving damages. As discussed above, Plaintiffs believe they have a fair chance to prevail at summary judgment and trial against the Defendants given the facts of the case, but recognize the factual difficulties presented and that the law in this area is rapidly developing and in some respects unsettled. Moreover, while Plaintiffs expect to establish damages at trial, the Defendants disagree with Plaintiffs' loss estimates and theories and would vigorously challenge them if the case were to proceed. In short, under the best of circumstances, trial is a risky business, and success cannot ever be guaranteed. *See, e.g., Woodward v. NOR-*

*AM Chem. Co.*, No. 94-780, 1996 U.S. Dist. LEXIS 7372, at *50-51 (S.D. Ala. May 23, 1996)  ("[a] settlement implicitly means settling for less than all that is sought; it is 'a reasoned choice of a certainty over a gamble, the certainty being the settlement and the gamble being the risk that comes with going to trial.'") (*quoting Reynolds v. King*, 790 F. Supp. 1101, 1105 (M.D. Ala. 1990) (citation omitted)).

As the court explained in *Officers for Justice v. Civil Serv. Comm'n.*, 688 F.2d 615, 624 (9th Cir. 1982), "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" (citation omitted).  Given that the Settlement provides to the Plans and their participants the potential for substantial value – up to $90 million from the change to the matching formula alone – once the risk of not prevailing is taken into account, it is abundantly clear that the Settlement is an excellent recovery in this hotly contested, complex litigation.

As noted above, this case presents many risks, including the risk that liability would not be established under ERISA, and that even with a liability determination, recoverable losses may not exceed the value of the Settlement.  Viewed in the context of the abundant risks presented in this case, the Settlement is an outstanding result.  Thus, the third factor strongly supports the approval of the proposed Settlement.

**D.    Factor Four - the Complexity, Expense, and Likely Duration of Continued Litigation.**

As this Court is well aware, ERISA litigation of this type is a rapidly evolving, complex, and demanding area of the law.  *See, e.g., Ikon*, 209 F.R.D. 94 (finding that the complexity and duration of litigation of similar breach of fiduciary duty claims, as well as the expense of litigation and risks of establishing liability and damages, weighed heavily in favor of settlement); *Enron*, 228 F.R.D. at 565; *In re Global*

*Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (finding that "[f]iduciary status, the scope of fiduciary responsibility, the appropriate fiduciary response to the Plans' concentration in company stock and [Global Crossing's] business practices would be issues for proof, and numerous legal issues concerning fiduciary liability in connection with company stock in 401(k) plans remain unresolved. These uncertainties would substantially increase the ERISA cases' complexity, duration, and expense – and thus militate in favor of settlement approval."). In the four years since Plaintiffs filed this action, numerous decisions have been rendered which have helped to define this area of law; however the rapid influx of new precedents presents an ever changing legal landscape, and there is a constant risk that the law will change before judgment.

Moreover, the demands on counsel and the Court are complex and require the devotion of significant resources. The parties' counsel have already expended substantial resources in litigating this case. If this settlement is not approved, substantial additional work will need to be performed, including the completion of fact and expert discovery, briefing on summary judgment, designation of witnesses and exhibits, preparation of pre-trial memoranda and proposed findings of fact and conclusions of law, presentation of witnesses and evidence at trial, and, depending on the trial Court's ruling on the merits, briefing of the losing party's almost-certain appeal.

Given the intensity of the defense to date, it is highly likely that Defendants would have continued their defense through trial and a probable appeal. The Settlement obviates that delay and will, if approved, advance the recovery to the

Plans, possibly by as much as several years. Thus, this factor also speaks strongly in favor of preliminary approval of the proposed Settlement.

**E.    Factor Five - Objections to the Settlement.**

In evaluating a proposed settlement, the Court should, of course, consider any objection raised. The ultimate fairness determination is left to the sound discretion of the Court, however, and the Court need not "open to question and debate every provision of the proposed compromise." *Cotton*, 559 F.2d at 1330-31. Indeed, objections are "not a controlling factor in that 'a settlement can be fair notwithstanding a large number of class members who oppose it.'" *Bennett v. Behring Corp.*, 96 F.R.D. 343, 353 (S.D. Fla. 1982) (citing *Cotton*, 559 F.2d at 1331), *aff'd*, 737 F.2d 982 (11th Cir. 1984) (approving settlement despite receipt of 654 objections in case affecting several thousand property owners living in thirty-one subdivisions where government had declined to bring a parallel case and the plaintiffs faced significant damages issues).

Here, despite having received notice and an opportunity to be heard as provided for in the Court's Preliminary Approval Order, to date, out of at least 71,810 Notices mailed, only forty-eight recipients, or 0.06%, have submitted objections to the Settlement. Of those, four objections were not timely filed with the Court[12] and eight objections were not timely served on Lead Counsel,[13] as required by the

---

[12] Objection of James R. Caudle (filed September 27, 2006; Docket No. 243); Objection of Margaret W. Noble (filed September 20, 2006; Docket No. 241); Objection of William E. Noble (filed September 20, 2006; Docket No. 240); Objection of Harold J. Wilson (filed September 25, 2006; Docket No. 242).

[13] Objection of Lewis Bostic (filed Sept. 18, 2006; Docket No. 235); Objection of Daryl T. Evans (filed Aug. 22, 2006; Docket No. 196); Objection of Virginia Q. Kaderabek (filed Sept. 18, 2006; Docket No. 234); Objection of Margaret W. Noble (filed September 20, 2006; Docket No. 241); Objection of William E. Noble (filed September 20, 2006; Docket No. 240);Objection of Mario L. Soto (filed Sept. 1, 2006; Docket No. 216); Objection of Gregory Mark Spitzer (filed Aug. 30, 2006;

Notice.[14]   Although the untimely objections need not be considered by the Court, Plaintiffs will nevertheless address them in the discussion that follows.

1.   **The Settlement Provides Benefits to Retirees and Does Not Release Any Individual Claims They May Have**

Thirty-two of the individuals raise a similar issue:  the contention that the Settlement Agreement does not provide sufficient relief for retirees and former employees of BellSouth.[15]   While Plaintiffs appreciate these individuals' concerns, they do not believe that the objections have sufficient merit to detract from the benefits of the Settlement.

---

Docket No. 209); Objection of Harold J. Wilson (filed September 25, 2006; Docket No. 242).

[14] Notice, ¶¶ 13 and 15.

[15]   Anonymous Objection to Settlement (filed Sept. 14, 2006; Docket No. 231); Objection of S. S. Ajanogha (filed Sept. 18, 2006; Docket No. 233); Objection of William J. Andrle, Jr. (filed Aug. 25, 2006; Docket No. 204); Objection of Raymond M. Baechle, Jr. (filed Sept. 11, 2006; Docket No. 226); Objection of Thomas M. Barnes (filed Sept. 15, 2006; Docket No. 232); Objection of Lewis Bostic (filed Sept. 18, 2006; Docket No. 235); Objection of David A. Brown (filed Aug. 28, 2006; Docket No. 207); Objection of David J. Carey (filed Aug. 24, 2006; Docket No. 200); Objection of Lois B. Carroll (filed Sept. 18, 2006; Docket No. 237); Objection of T.C. Carroll (filed Sept. 18, 2006; Docket No. 238); Objection of Gwendolyn T. Chavis (filed Aug. 25, 2006; Docket No. 202); Objection of Douglas A. Cole (filed Sept. 7, 2006; Docket No. 224); Objection of Dale O. Cummings (filed Aug. 30, 2006; Docket No. 213); Objection of Daryl T. Evans (filed Aug. 22, 2006; Docket No. 196); Objection of Peter R. Green (filed Aug. 30, 2006; Docket No. 212); Objection of John Hand (filed Aug. 23, 2006; Docket No. 198); Objection of Charles Hardison (filed Sept. 5, 2006; Docket No. 221); Objection of Monta A. King (filed Aug. 25, 2006; Docket No. 203); Objection of Gregory D. Kirby (filed Aug. 25, 2006; Docket No. 201); Objection of Jonathan W. Marshall (filed Aug. 28, 2006; Docket No. 205); Objection of Alan T. Millsaps (filed Aug. 29, 2006; Docket No. 211); Objection of Margaret W. Noble (filed September 20, 2006; Docket No. 241); Objection of William E. Noble (filed September 20, 2006; Docket No. 240); Objection of Susan O'Bryan (filed Sept. 8, 2006; Docket No. 225); Objection of Mario L. Soto (filed Sept. 1, 2006; Docket No. 216); Objection of Laverne O. Stevens (filed Sept. 5, 2006; Docket No. 220); Objection of Reezin N. Swilley (filed Aug. 23, 2006; Docket No. 199); Objection of Ella Q. Thomas (filed Sept. 13, 2006; Docket No. 229); Objection of Gilbert Thomas (filed Aug. 28, 2006; Docket No. 208); Objection of Gary W. Weaver (filed Sept. 18, 2006; Docket No. 239); Objection of Harold J. Wilson (filed September 25, 2006; Docket No. 242); Objection of Randy S. Young (filed Sept. 7, 2006; Docket No. 223).

As explained in Section II.C, above, the Settlement terms are quite unique and the release is very narrowly tailored. As an initial matter, all participants of the Plans, whether current BellSouth employees or retirees, stand to benefit from the revised investment alternatives, such as lifecycle funds, as well as investor education, provided under the Settlement. Furthermore, all employee participants are eligible to benefit from the change to the Plans' matching contribution formula. This change alone could bring as much as $90 million in additional matching contributions to the Plans, which contributions will be made in cash and allocated to the accounts of employee participants, who make up nearly seventy percent of the total participants.

In exchange for the relief provided under the Settlement Agreement, the Plans' claims for monetary relief under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), are released. However, these are claims that inure only to the benefit of the Plans, not to individual participants, and § 502(a)(2) does not allow for claims by participants for individual relief – only for relief on behalf of a plan. The Settlement does not release any claims for individual relief that may be brought by the Plans' current or former participants under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Nor does the Settlement release any claims by the Plans or by individual participants for relief in the Securities Litigation.

### 2. Objections by Those Who Generally Disapprove of this Litigation Should Not Preclude Settlement

Six objectors appear to believe that BellSouth and the other Defendants did nothing wrong and the case should not have been brought.[16] While these individuals

---

[16] Objection of Lewis Bostic (filed Sept. 18, 2006; Docket No. 235); Objection of Troy Dunham (filed Aug. 23, 2006; Docket No. 197); Objection of Jill M Hugentugler (filed Sept. 13, 2006; Docket No. 228); Objection of Eric B. Seidel (filed Sept. 6, 2006; Docket No. 222); Objection of Gregory Mark Spitzer (filed

have attempted to utilize the objection process as a forum to express their views, Plaintiffs believe their "objections" to be without merit and inappropriate at this juncture. This Court previously acknowledged the legitimacy of Plaintiffs' claims in denying Defendants' motion to dismiss. Defendants are ably represented by their counsel. Any objections to this litigation in general, rather than to the Settlement, should be disregarded.

### 3. Plaintiffs' Attorneys' Fees and Costs are Reasonable

Of the 71,810 Notices mailed, only five recipients have raised the issue of the reasonableness of the attorneys' fees and costs to be paid pursuant to the terms of the Settlement Agreement.[17] Under the terms of the Settlement, Co-Lead and Liaison Counsel are to receive $3 million in full satisfaction of the fees and costs they have incurred in this litigation on behalf of Plaintiffs and the Plans. The Joganic/RSP counsel are to receive $675,000 in fees and expenses in recognition of their efforts taken on behalf of the RSP.

The fact that the fees here were negotiated at arm's-length underscores the fact that the fees are reasonable and should be approved. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (an agreed-to fee is an ideal situation because "[a] request for

---

Aug. 30, 2006; Docket No. 209); Objection of C. D. Whatley (filed Aug. 31, 2006; Docket No. 214).

[17] Objection of Monta A. King (filed Aug. 25, 2006; Docket No. 203); Objection of Laurie W. Scholl (filed Sept. 18, 2006; Docket No. 236); Objection of Eric B. Seidel (filed Sept. 6, 2006; Docket No. 222); Objection of David G. Woodruff (filed Aug. 31, 2006; Docket No. 215); Objection of Huishan Zhou (filed Sept. 1, 2006; Docket No. 218). In addition, in his untimely objection, Harold J. Wilson, Jr. states that "it would be nice to know what the attorneys' fees are." Objection of Harold J. Wilson (filed September 25, 2006; Docket No. 242). Plaintiffs' attorneys' fees and expenses were discussed with the Court at the preliminary approval conference and are addressed herein.

attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

Even more importantly, Plaintiffs' counsel have negotiated a settlement that will create important relief for the Plans and their participants going forward, adequately addressing some of "the problems that necessitated the filing of this lawsuit originally." *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 118 (E.D. Pa. 2005) (approving a "creative and useful" settlement that achieved a "fair and reasonable resolution"). Enormous time and effort were devoted to this case. The efforts of Plaintiffs' counsel were intensive, carefully coordinated, and efficient. Defendants, who were represented by prominent counsel, devoted at least as many, and possibly many more resources to pretrial efforts, and put Plaintiffs' counsel through their paces at every stage of the case. Plaintiffs' counsel should receive adequate remuneration for their efforts. *See, e.g., Saunders v. Berks Credit & Collections, Inc.*, No. 00-3477, 2002 U.S. Dist. LEXIS 12718, at *42 (E.D. Pa. July 12, 2002) (concluding that an inadequate award of attorneys' fees "would deter counsel from undertaking such socially beneficial litigation").

Furthermore, as Plaintiffs' counsel and the Court discussed at length at the preliminary approval conference and as Plaintiffs' counsel has discussed with the Independent Fiduciary – who has stated that the Settlement, including agreed-upon fees, is reasonable – these sums represent only a fraction of the fees and costs incurred in taking this case through the pleading stage, motions practice, well into discovery, and lengthy, hard-fought settlement negotiations. With respect to the settlement negotiations, Plaintiffs' counsel, and in particular Lead Counsel, dedicated

enormous time and energy to what has been by all accounts a complex, nuanced and protracted settlement process.

To date, at least 13,540 hours of attorney and staff time have been incurred in this case. As discussed at the preliminary approval conference, the hourly rates billed are customary for attorneys of this practice area and experience. Each of the firms also utilized non-lawyer support personnel, including paralegals in the traditional sense and additional support staff, including financial and accounting analysts. The efforts of these personnel contributed substantially to the overall efficiency and cost-effectiveness of counsel's representation of the Plaintiffs.

This occurred, in part, because lawyers were able to rely on support personnel at lower rates to do much of the work of processing the vast flow of documents and information in the case. In other respects this efficiency and cost-effectiveness was achieved because initial analysis could be done "in house" at far less cost than if all such tasks had to be farmed out to experts from the beginning. These tasks were crucial and inextricably intertwined with counsel's legal and factual development and presentation of the Plaintiffs' claims. These efforts directly supported both the litigation efforts of counsel and provided a significant part of the information base for the follow-up analysis and opinions of Plaintiffs' experts.

To date, Plaintiffs' counsel has incurred at least $4,872,588 in fees[18] and $271,513 in costs, which is well above the amount set forth in the Settlement Agreement to be paid to Plaintiffs' counsel for both fees and costs. The Settlement Agreement represents a major benefit to the Plans with immediate and substantial

---

[18] Plaintiffs' attorney fee calculations consist of the number of hours worked by each attorney or staff person, multiplied by that person's hourly billing rate. No multiplier has been applied.

economic value and ongoing structural reform that will substantially insulate the Plans and their participants from the causes of the harm that led to this case in the first place. Given that "[t]he fees plaintiff's counsel requests are less than the total market value of services they rendered," Plaintiffs' counsel respectfully submit that the agreed-upon fee and cost amounts are reasonable. *Saunders*, 2002 U.S. Dist. LEXIS 12718, at *46. Consequently, the objections to this provision of the Settlement Agreement should be rejected.

### 4.  The Remaining Objections Lack Merit

Four objectors contend that the relief provided for in the Settlement Agreement is insufficient.[19]  As noted above, in evaluating the fairness of the Settlement, the Court should not try the case on the merits nor make Plaintiffs justify each settlement provision against a hypothetical background of what might have been. *Cotton*, 559 F.2d at 1330; *accord, Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974) (affirming settlement approval despite objection by twenty percent of the class). Rather, the court is entitled to rely upon the judgment of experienced counsel for the parties, particularly where, as here, the settlement has been negotiated at

---

[19]Objection of James R. Caudle (Received by Lead Counsel Sept. 18, 2006) (stating, in part, that "[t]he settlement does not match the seriousness of the Complaint."); Objection of Gail M. Sheffield (filed Aug. 30, 2006; Docket No. 210) (stating, in part, that "in addition to the proposed settlement, the plaintiffs are entitled to a monetary sum representative of the loss suffered by having to invest in BellSouth stock plan instead of more lucrative funds. I am making 20% on my funds at this time"); Objection of Theofas G. Stringer (filed Sept. 11, 2006; Docket No. 227) (stating, in part, that "Plaintiffs should receive monetary compensation now to be made whole for the company's past actions."); see also Objection of Phillip Mark Brauckmann (filed Sept. 14, 2006; Docket No. 230) (incorrectly stating that the "settlement does nothing to compensate plan participants who were not allowed to sell BellSouth shares while it declined in value" and asking whether the Plans "have any liability for not allowing transfers out of the stock."). Per his request, Plaintiffs' counsel has spoken with Mr. Brauckmann, who stated that we had more than satisfactorily answered his questions and indicated his intent to withdraw his objection.

arm's-length with the assistance of an experienced mediator, as well as sanctioned by an independent fiduciary on behalf of the Plans. *Cotton*, 559 F.2d at 1330.

Particularly after the extensive discovery that has been done and consultation with damages and other experts, as explained above, Plaintiffs believe that the risks of continued litigation are extremely high and that Settlement provides valuable, substantive relief for the Plans. Plaintiffs have firsthand knowledge of the nature and quantity of evidence that has been uncovered supporting their claims, as well as the defenses raised by Defendants, as well as the specific challenges they would face in litigating these ERISA claims through summary judgment and, hopefully, trial. The judgment of Plaintiffs and their attorneys is entitled to deference, and objections made by individuals who lack Plaintiffs' familiarity with the ongoing issues of the litigation should not preclude approval of the Settlement Agreement.

Finally, four individuals have submitted objections that are completely unrelated to this ERISA case and the Settlement. John Karry objects "on the philosophical grounds of allowing companies to align employee risk/reward with that of the company. Funding ERISA with BellSouth shares achieved said alignment." Objection of John Karry (filed Aug. 28, 2006; Docket No. 206). While not entirely clear, it appears that Mr. Karry agrees with the allegations of the Complaint that the Plans should not have invested in BellSouth stock. Furthermore, the Settlement Agreement ensures that the Company matching contributions will be paid in cash, rather than BellSouth stock going forward, and that no participant will be required to hold any portion of his or her account in BellSouth Stock. Consequently, because there appears to be no connection between the Settlement Agreement and Mr. Karry's concerns, his objection should be disregarded.

Similarly, Virgiania Kaderabek writes that she "do[es] not feel secure with AT&T in charge," presumably referring to the pending acquisition of BellSouth by AT&T.  Objection of Virginia Q. Kaderabek (filed Sept. 18, 2006; Docket No. 234). Cognizant of the potential for the AT&T acquisition, the parties added paragraph 4.1(g) to the Settlement Agreement, which states that "[i]f BellSouth is acquired by or merged with another company, the successor company will execute and perform BellSouth's obligations under this Agreement on terms not materially less favorable than those enumerated in subparagraphs (a) through (f) above."  While the Settlement Agreement provides that AT&T will assume BellSouth's Settlement-related obligations should the acquisition be consummated, Ms. Kaderabek's objection appears to relate to the acquisition in general.  Insofar as she does not appear to raise any objection to the Settlement or identify a single substantive reason why AT&T could not comply with any post-acquisition Settlement obligations, and claims regarding any potential business combination between BellSouth and AT&T are not released, Ms. Kaderabek's objection should be disregarded.

Likewise, David Souchay appears to be looking for relief relating to the termination of his employment back in 1995.  Objection of David S. Souchay (filed Sept. 1, 2006; Docket No. 217).  Insofar as he does not appear to raise any objection to the Settlement, and claims regarding his employment are not released, Mr. Souchay's objection should be disregarded.

Finally, the objection of Steven Garner states no reason at all for an objection to the Settlement, and should therefore be disregarded.  Objection of Steven P. Garner (filed Sept. 5, 2006; Docket No. 219).

Because all other factors discussed herein support the fairness and adequacy of the Settlement and demonstrate that an outstanding result has been achieved, the relatively minute percentage of objections is a further factor weighing in favor of approval of the settlement.  And the fairness of the settlement is further evidenced by the approval of U.S. Trust, the Independent Fiduciary retained by the Plan Sponsor to evaluate the fairness of the Settlement to the Plans, which found that the Settlement is a fair resolution of disputed claims.  It reached this conclusion after its detailed review of the record, review of documents provided by counsel upon request, and extensive in person and telephone interviews with counsel for the parties, as well as the mediator.

Counsel are proud of the settlement achieved in this case, and are prepared to explain the benefits achieved to the Court, and to any other interested party permitted to appear at the Fairness Hearing.

**F.    Factor Six - the Stage of Proceedings at the Time of Settlement.**

This litigation began September of 2002, with the filing of numerous complaints, followed by appointment of Lead Counsel and filing of the Consolidated Complaint on April 21, 2003.  The comprehensive informal and formal discovery conducted, extensive motion practice, and the exhaustive negotiation process have enabled the parties to develop the issues in this case to an appropriate point for settlement.  While there is much to be done to prepare the case for trial, Plaintiffs are fully cognizant of the strength and weaknesses of their claims, and the risks that they face, and believe without hesitation that the Settlement is in the best interests of the Plans and their participants.   Even after the parties commenced settlement discussions, the Settlement was not achieved quickly or easily, but rather required

over six months of hard-fought negotiations, both directly among the parties and with the assistance of expert mediator Judge Politan.  Taking this and the other factors discussed above into account, Plaintiffs respectfully submit that the Settlement is fair, adequate, and reasonable, and should be preliminarily approved at this time.

## IV.    CONCLUSION

After several years of hard-fought litigation in a difficult and complex case, a settlement has been achieved that provides substantial and meaningful relief to the Plans and their participants.  Plaintiffs and their counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate, and the parties' proposed Final Order and Judgment be entered.

Respectfully submitted this 3rd day of October, 2006.

KELLER ROHRBACK L.L.P.

By: s/  Elizabeth A. Leland
    Elizabeth A. Leland
Lynn Lincoln Sarko
Ron Kilgard
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone:  (206) 623-1900    (Seattle)
Telephone:  (602) 248-0088    (Phoenix)
Facsimile:   (206) 623-3384    (Seattle)
Facsimile:   (602) 248-2822    (Phoenix)

**Co-Lead Counsel for Plaintiffs**

Richard S. Schiffrin
Joseph H. Meltzer
Edward W. Ciolko
Katherine Bornstein
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**Co-Lead Counsel for Plaintiffs**

Corey D. Holzer
(Georgia Bar No. 364698)
Michael I. Fistel, Jr.
(Georgia Bar No. 262062)
HOLZER & HOLZER LLC
1117 Perimeter Center West, Suite E-107
Atlanta, Georgia  30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

**Plaintiffs' Liaison Counsel**

David F. Walbert
PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth St., 26th Floor
Atlanta, Georgia  30309
Telephone:  (404) 873-8000
Facsimile  (404) 873-8050

Joe R. Whatley
Glen M. Connor
WHATLEY DRAKE
2323 2nd Avenue North
Birmingham, Alabama 35203
Tel: (205) 328-9576
Fax (205) 328-9669

Ernest Cory
G. Rick DiGiorgio
CORY, WATSON, CROWDER &
DEGARIS
2131 Magnolia Avenue
Birmingham, Alabama  35205
Telephone:  (205) 828-2200
Facsimile:  (205) 324-7896

Christopher A. Seeger
Steven A. Weiss
SEEGER, WEISS, LLP
One William Street, 10th Floor
New York, NY 10004
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799

**Joganic/RSP Plaintiffs' Counsel**

CERTIFICATE OF CERTIFICATION
OF COMPLIANCE WITH LR 5.1C

I hereby certify that the foregoing PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF ERISA SETTLEMENT AGREEMENT was prepared with one of the font and point selections approved in LR 5.1C.

KELLER ROHRBACK L.L.P.

By: s/
_____
    Elizabeth A. Leland
Lynn Lincoln Sarko
Ron Kilgard
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 623-1900 (Seattle)
Telephone: (602) 248-0088 (Phoenix)
Facsimile: (206) 623-3384 (Seattle)
Facsimile: (602) 248-2822 (Phoenix)
**Co-Lead Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I, Cathy A. Hopkins, Legal Assistant, hereby certify that the foregoing document was prepared with one of the font and point selections approved in LR 5.1C and was electronically filed on October 3, 2006, with the Clerk of the Court using CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

| | |
|---|---|
| H. Douglas Hinson | dhinson@alston.com |
| Patrick C. DiCarlo | pdicarlo@alston.com |
| Peter M. Varney | pvarney@alston.com |
| Ashley B. Watson | ashley.watson@bellsouth.com |
| Joseph H. Meltzer | jmeltzer@sbclasslaw.com |
| Edward W. Ciolko | eciolko@sbclasslaw.com |
| Katherine B. Bornstein | kbornstein@sbclasslaw.com |
| Michael I. Fistel, Jr. | mfistel@holzerlaw.com |
| Cory Daniel Holzer | cholzer@holzerlaw.com |
| Glen M. Connor | gconnor@whatleydrake.com |
| Joe R. Whatley | jwhatley@whatleydrake.com |
| David Walbert | dwalbert@pcwlawfirm.com |

Dated: October 3, 2006, in Seattle, Washington.

　s/　Cathy A. Hopkins
Cathy A. Hopkins
Legal Assistant
KELLER ROHRBACK L.L.P.
Lynn Lincoln Sarko
Elizabeth A. Leland
Ron Kilgard
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone:　　(206) 623-1900　　(Seattle)
Facsimile:　　(206) 623-3384　　(Seattle)