UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE BELLSOUTH CORPORATION ERISA LITIGATION | MASTER FILE: 1:02-CV-2440-JOF |
| THIS DOCUMENT RELATES TO: All Actions | |

### DECLARATION OF NICHOLAS H. POLITAN

1. I am an attorney licensed to practice in New Jersey since 1960. Following a successful career in private practice and as a United States Judge for the District of New Jersey, I became active as a mediator. A copy of my resume is attached.

2. I was retained by the parties to mediate a settlement of the above-captioned ERISA case. The mediation process is confidential, but both parties have authorized me to inform the Court of the matters presented in this declaration. I make this declaration based on personal knowledge and am competent to testify to the matters set out herein.

3. The mediation of this case included separate, lengthy meetings with each side, a mediation session in Atlanta on November 1-2, 2005, and numerous informal telephone conferences with counsel thereafter. I also received written submissions of the parties and reviewed numerous documents, including the complaint, plan documents and summary plan descriptions, and this Court's opinion on Defendants' motion to dismiss, *Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361 (N.D. Ga. 2004).

4.    Based on my participation, it appeared that all parties conducted themselves in a prompt, professional manner and that all parties are represented by able, well-prepared counsel who were informed regarding the material aspects of the case. The negotiations were vigorous and protracted.

5.    It also appeared to me that counsel were motivated in seeking a resolution by the clients' best interests and that their negotiating positions were informed by the same. I did not observe anything that suggested to me that there was any collusion or other untoward behavior on the part of any counsel of party. In fact, it was apparent that this was not the case. The ultimate terms of the settlement did represent a compromise of the parties' initial positions, but it was my strong belief that these compromises were the product of the parties' assessment of the perceived relative strengths and weaknesses of their positions, and the risks inherent in continued litigation.

6.    Based on my observations, the negotiations appeared to be hard-fought and arm's length.

Dated: September 29, 2006.

_____
NICHOLAS H. POLITAN

# Nicholas H. Politan

District Judge; New Jersey
5076 United States Courthouse
50 Walnut Street
Newark, NJ 07102
(973) 645-6340
Born 1935; appointed in 1987 by President Reagan

**Education** Rutgers Univ., A.B., 1957, LL.B.. 1960, law review

**Private Practice** Cecchi and Politan, Lyndhurst, N.J., 1961-64, 1972-87; Krieger, Chodash & Pelican, Jersey City, N.J. 1964-72

**Clerkships** Law Clerk, Hon. Gerald McLaughlin, United States Court of Appeals, Third Circuit, 1960-61

**Other Employment** Director and Chairman, Executive Committee, County Trust Company, 1980-87

**Professional Associations** A.B.A.; Federal Bar of N.J.; N.J. Bar Assn.; Bergen County Bar Assn.; Essex County Bar Assn.

**Other Activities** Essex County Country Club, West Orange, NJ.

**Honors and Awards** Prizes in Corporations, Evidence, Bills and Notes, Rutgers Law School; Instructor of legal research and writing, Rutgers Law School, 1963; Award from the Morgagni Society; Distinguished Service Award Rodino Society, Seton Hall University School of Law; Ellis Island Medal of Honor Society Recipient, 1995;

**Noteworthy Rulings** 1989: In an action brought under the Clean Water Act by environmental groups, Politan imposed a $3.2 million civil penalty on the defendant after finding that it had committed 386 violations of the law in connection with discharges into the Kill Van Kull. "A recalcitrant company in the private sector of the economy, combined with lethargic enforcement of the applicable statutes and regulations . . . has caused a continuing, if not constant. 11 year contribution to the pollution of the Kill Van Kull," Politan said. He ordered that the penalty be paid into a special trust fund to remedy environmental problems in New Jersey. *PIRG v. Powell Duffryn Terminals Inc.* 720 F. Supp. 454 (D.N.J. 1989), vac, 906 F.2d 961 (3rd Cir. 1990)

1990: In a sex discrimination cast, Politan *held* that the Seventh Amendment required that *the* plaintiff be granted a jury trial on a claim brought under the New Jersey Law Against Discrimination. The New Jersey Supreme Court had ruled in a prior case that a litigant had *no such right in state* court. But Politan said aspects of the law "are sufficiently similar to various common law actions" to bring the plaintiff's claim within the scope of the Seventh Amendment, which guarantees the right to a jury trial in suits at common law. *Reiner vv. New Jersey, 732 F. Supp.* 530 (D.N.J. 1990).

1990: In the case of an assistant professor who was denied a promotion to full professor at Rutgers University, Politan found civil rights law applicable and permitted the suit to go forward under 42 U.S.C. §1981. He ruled that the situation was one of a hiring decision, not a post-contractual decision, because a promotion would have created a new and distinct contractual relationship *between* the plaintiff and the university. The prestige and public perception. *and his* function within the university, of a full professor is significantly different from that of an assistant professor. *Bennun v. Rutgers. 5$ U.S.L.W. 2712 (1990).*

1994: In an opinion which came four months after the conclusion of the fraud trial of Eddie Antar, convicted of defrauding investors in his chain of "Crazy Eddie" electronic stores. Politan criticized post-trial interviews of jurors as a subversion of the sanctity of secret deliberations and trial by jury. Politan set limits on how reporters may conduct interviews of jurors and threatened to cite any reporter who breaks *his rules* for contempt. The opinion came in response to a petition from The Star Ledger of *Newark. The Associated* Press and the New Jersey Press Association seeking a transcript with the names and addresses of the jurors because their reporters did not hear the names in open court.

While Politan acknowledged "a First Amendment right of access" to those jurors identities he cautioned that the secrecy and privacy of jury deliberations served a compelling governmental and societal interest. Politan imposed the following three conditions on reporters and notified the jurors by letter of his decision. First, as a protection against harassment, a reporter may not make repeated requests for an interview. Second, once a juror expresses a desire to conclude an interview, the interviewer must immediately cease all questioning. Third. a reporter may not ask about votes, statements, opinions or comments of jurors other than those of the juror being interviewed.

United Stares v. Antar, 839 F.Supp. 293 (D.N.J. 1994). New York Times, December 29. 1993 The Third Circuit ruled that Politan went too far when he restricted what reporters could ask jurors. holding that restrictions imposed by Politan were "not supported by an actual or potential threat either of juror harassment or of invasion of the deliberative process as it was taking place...there was no evidence or even allegation of misbehavior by the press." The court upheld, with reservations. Politan's order that reporters may not ask jurors how other jurors voted. But it vacated his ban on reporters' "repeated" juror contacts and his order that reporters must cease asking questions once a juror expressed a desire to end an interview. United Stares v. Antar. 38 F.3d 1348 (3rd Cir. 1994), National Law Journal. November 14. 1994.

1995: A Third Circuit panel reversed the criminal conviction of "Crazy Eddie" Antar on the grounds that Politan was biased against the defendant. Politan presided over the civil trial of Antar in 1989, and ordered that the former electronics mogul turn over $52 million that he had allegedly stashed around the world. Antar fled the country. and Politan issued a default judgment against him. Antar was arrested in Israel in 1992 and returned to the United States to stand trial on criminal charges of racketeering. securities fraud. and mail fraud. Politan was the presiding judge and Antar was convicted and sentenced to twelve-and a-half years in prison. The appeals court reversed the sentence, saying that Politan's words at Antar's sentencing were evidence of his bias in the case. Politan said. "My object in this case from day one has always been to get back to the

public that which was taken from it as a result of the fraudulent activities of this defendant and others." United Stares ▶ .. Antar. 53 F.3d 568 (3rd Cir. 1995), American Lawyer. June 1, 1995

1995: Politan rejected a challenge to New Jersey's "family cap" policy, which denies welfare benefits to mothers who give birth to more babies while they are receiving public aid. The suit, brought by the ACLU. NOW Legal Defense and Education Fund and Legal Services of New Jersey, argued that the policy interfered with what should be a private reproductive decision. Politan ruled that the policy "does not fetter or constrain the welfare mother's right to bear as many children as she chooses: but simply requires her to find a way to pay for her progeny's care." Washington Post. May 5, 1995.

1995: Politan ruled that applying community notification of a sex offender's conviction under "Megan's Law" retroactively is unconstitutional additional punishment for released sex offenders. National Law Journal, March 13, 1995.

1996: Politan issued an order temporarily barring officials from notifying schools and other institutions that a man now living in Northern New Jersey pleaded guilty two decades ago to molesting and killing two boys. This was yet another ruling in an ongoing conflict over the constitutionality of "Megan's Law." The New Jersey Supreme Court declared certain provisions of the law, which were under review by a Federal appeals court. constitutional. Politan ruled in February 1995 that "Megan's Law" was unconstitutional because it imposes extra punishment on people who have already served their sentences. New York Times, January 24, 1996

Politan extended the temporary order, but said he would not permanently block notification until a decision on an earlier case was reached by the Federal appeals court. In making his decision, Politan cited a letter sent to the sex offender's home in Englewood that said. "They should send you away to the gas chamber" and "Go away, we don't want you here. You should kill yourself. You have no good reason for living." Politan said that the letter was an example of the "irreparable damage" caused by "Megan's Law." New York Times, February 2, 1996

**Media Coverage** 1996: At a conference on judicial independence at Rutgers Law School in Newark, Politan told lawyers and law students that judges must not allow "public outrage or scorn" to influence their decisions. Politan has been widely criticized, by politicians as well as the public, for questioning the constitutionality of "Megan's Law," He told his audience that a judge who gives in to pressure on controversial issues is "prostituting the courts." Politan said that many politicians have publicly criticized valid legal decisions simply to score "brownie points" with some voters. He said, "Legislators should know better." Politan said of his opinions dealing with Megan's Law, "These decisions were not easy ones and were rendered after painstakingly careful research and deliberation. Apparently, however, certain politicians would have had me turn a blind eye to the Constitution, the supreme law of the lawn, and be swayed by public sentiment." New Jersey Lawyer, October 14, 1996.

**Lawyers' Evaluation** Politan has outstanding legal skills, according to lawyers interviewed. "He's an excellent judge. He's first-rate in every category." "He's great." "He is a ver6y fine judge" "He has a very high level of ability." "He is a very good practical judge." "He has a lot of courage." "He's a grade above mot of the other judges in the district." "He's very bright."

"He's decisive and very practical." "He's a bright guy." "He's a 10 on a scale of one to 10. He's very impressive." "He has a n excellent command of the law, and he has very good analytical skills." "He's very astute." "He cuts through the thick of things." "He deserves high marks." "He's one of our stronger judges. He's brilliant." "He's very smart, but he's also quite practical in his treatment of the law." "He's very bright."

Lawyers said that Politan has a very good judicial temperament. "He has a great temperament. He's funny, and he treats lawyers very, very well." "He's a heck of a nice guy." "He puts people at ease. He has a good sense of humor." "He treats lawyers fine." "I've had very positive experiences with him." "I like him a lot. He's very fair to everyone in his courtroom." "He's pleasant." "He's not afraid to state his mind, but he has a good sense of humor, too." "How he treats lawyers depends on the lawyer. I've had a great time in front of him. Sometimes Judge Politan develops very strong feelings about a case, and a lawyer might feel that."

Lawyers said that Politan's courtroom is well-managed. "He allows you to try your case. He is not overly intrusive." "He's a good trial judge. He'll rein in lawyers when need be, but he'll usually let you try your case." "he's very decisive." "He maintains firm control of his courtroom. He does a good job." "He gets his decisions out." "He's very decisive on the bench." "He is a good case manager."

Politan promotes settlement, according to the lawyers interviewed. "He knows how to clear his cases and how to cut deals. He's the best settler on the bench." "He participates actively in settlement. He's very effective." "He's one of the most effective judges in the district when it comes to settlement. He doesn't just leave it to his magistrate." "He really pushes it sometimes." "He is excellent at settling." "He is good at settling cases. He's very coercive. If he wants to, he'll make you settle if he can find a way to."

Plaintiffs' attorneys said that Politan is fair-minded. "He does a good job, He's very judicious in his approach to every case. He doesn't pre-determine anything." "He's not plaintiff- or defendant-oriented." "He's very fair." "He's impartial."

Civil defense lawyers found Politan to be neutral. "He shows no bias." "he's straight down the line." "He's fair." "Judge Politan demonstrates o bias." "He's not partial to either side." "He's too quick to make up his mind. He's not evenhanded as he should be."

Criminal defense lawyers said that Politan is fair at trial. "He has no bias in criminal cases ." "He's absolutely impartial at trial." "He's not prosecution- or defendant- oriented."

Lawyers said that Politan varies in his sentencing. "He cannot be pigeonholed. How strict he is on sentencing depends on the nature of the case. Generally, he's very tough." "He's hard to predict when it comes to sentencing. Just when you expect him to really lay it on a defendant, he'll ease up." "He tailors his sentences to the case and to the defendant. He has some decency on sentencing, sometimes. Other times, he'll sentence at the high end."

NICHOLAS H. POLITAN
5 Becker Farm Road, Fourth Floor
Roseland, NJ 07068

973-994-4740                                                    Fax 974-994-4755

September 1, 2006

Judge Politan has mediated in excess of 300 cases since retiring from the bench in 2002. Some representative cases are listed below:

IPO Securities Litigation
In re Bank America Corp. Securities Litigation
Buxbaum v. Deutsche Bank
Talalai & Thompson v. Cooper Tire & Rubber Co.
National Auto Finance Company, Inc. Securities Litigation
EquiMed Inc. Securities Litigation
Jefferson Pilot Securities Litigation
Quorum Securities Litigation
Daimler Chrysler
Ashworth, Inc.
Elan Securities Litigation
In re Lernout & Hauspie Securities Litigation
Gadsby v. GTE Operations Support Incorporated, et al.
Jennifer Convertibles
In re Neatease.com, Inc. Securities Litigation
Federal Insurance v. Banc of America
American Motorists Ins. Company and American International Specialty Lines
Meridian Investment Club v. Delta Financial
Vodafone Group
El Paso Co. Securities Litigation
Archdiocese of Louisville Sexual Abuse Cases
Sensomatic Electronics Corp. Securities Litigation
Gardner v. Bank of America (Ocean Club Condominium Association)
Loreal v. Clairol
In re Viropharma Securities Litigation
Raytheon Company Securities Litigation
Scheiner v. 1-2 Technologies
Scognarillo v. Credit Suisse
In re AMF Bowling Securities Litigation
In re Newpower Securities Litigation
Bed Bath & Beyond v. Sprint Communications

                                             Very truly yours,

                                             Susan Gonnelli
                                             Assistant to Hon. Nicholas H. Politan